ACCEPTED
01-14-00801-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
1/26/2015 3:29:50 PM
CHRISTOPHER PRINE
CLERK

**Nos. 01-14-00801-CV,
and 01-14-00798-CV**

_____

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
1/26/2015 3:29:50 PM
CHRISTOPHER A. PRINE
Clerk

**IN THE COURT OF APPEALS
FOR THE FIRST JUDICIAL DISTRICT
OF TEXAS AT HOUSTON**

_____

**IN THE INTEREST OF
I.M., A.M. and J.M., Children**

_____

**A.J.M. Appellant**

**v.**

**DEPARTMENT OF FAMILY & PROTECTIVE SERVICES, Appellee**

_____

**APPEALED FROM THE 315th DISTRICT COURT OF HARRIS COUNTY,
TEXAS, Trial Cause Nos. 2013-044767J, and 2011-00219J**

_____

**APPELLEE'S BRIEF**

VINCE RYAN, COUNTY ATTORNEY
State Bar #99999939
By: **Robert J. Hazeltine-Shedd**
Assistant County Attorney
State Bar #24067652
1019 Congress, 17th Floor
Houston, Texas 77002
Phone: 713/274-5292; Fax: 713/437-4700
Email: robert.hazeltine-shedd@cao.hctx.net
Attorney for Appellee
Texas Department of Family
and Protective Services

ORAL ARGUMENT REQUESTED

i

# TABLE OF CONTENTS

Table of Contents .............................................................................. ii

Index of Authorities ......................................................................... iii

Request for Oral Argument .................................................................v

Statement of the Case.......................................................................vi

Reply Points ................................................................................... vii

Statement f Facts .............................................................................1

Summary of Argument....................................................................19

Argument and Authorities...............................................................24

**Reply Point One**: **There was legally and factually sufficient evidence to support the court's predicate findings for termination of the appellant's parental rights** ...................................................................................24

    1. Applicable Law and Scope of Review.....................................24

    2. Standard of Review................................................................31

    3. There was conclusive proof of the parents' pattern of endangering conduct under subsection (E) where it was undisputed that the Appellant Father jeopardized his children by continuing in criminal activities, continuing in illegal drug activities, and failing to complete the Department's plan for reunification…......................................................32

**Reply Point Two**: **Though review of this ground is unnecessary, there was sufficient evidence to support the trial court's termination of the Appellant Father's parental rights under subsection (O)** ....................................45

Prayer for Relief..............................................................................50

Certificate of Service ......................................................................51

Certificate of Compliance With Word Count......................................51

# INDEX OF AUTHORITIES

**CASES**                                                                    **PAGE**

*Boyles v. Kerr*, 855 S.W.2d 593 (Tex. 1993) ........................................................27

*Compania Financiara Libano, S.A., v. Simmons*, 53 S.W.3d 365 (Tex. 2001)........28

*Hercules Offshore, Inc. v. Excel Crane & Hydraulics, Inc.*, No. 01-13-00817-CV, 2014 WL 6601644 (Tex. App.—Houston [1st Dist.] 2014, no pet.).................28, 29

*Horizon/CMS Healthcare Corp. v. Aula*, 34 S.W.3d 887 (Tex. 2000).....................27

*In re A.V.*, 113 S.W.3d 355 (Tex. 2003).................................................................46

*In re B.B.*, 971 S.W.2d 160 (Tex. App.—Beaumont 1998, pet. denied)..................33

*In re B.H.*, No. 01-10-00415—CV, 2011 WL 4501940 (Tex. App.—Houston [1st Dist.] 2011, no pet.)............................................................................................33

*In re C.E.K.*, 214 S.W.3d 492 (Tex. App.—Dallas 2006, no pet.) ..........................40

*In re C.H.*, 89 S.W.3d 17 (Tex. 2002) ...................................................................31

*In re. E.C.R.*, 402 S.W.3d 239 (Tex. 2013) ....................................................23, 46

*In re G.A.*, 01-11-00565-CV, 2012 WL 1068630 (Tex. App.—Houston [1st Dist.] Mar. 29, 2012, pet. denied) .................................................................................35

*In re. J.F.C.,* 96 S.W.3d 256 (Tex. 2002) .........................................................31, 32

*In re K.G.,* 350 S.W.3d 338 (Tex. App.—Fort Worth 2011, pet. denied)..........28, 29

*In re. R.M.S.*, No. 01-13-00331-CV, 2013 WL 5637703 (Tex. App.—Houston [1st Dist.] Oct. 11, 2013, no pet.)..............................................................7 fn.4, 49-50

*In re T.G.R.-M.*, 404 S.W.3d 7 (Tex. App.—Houston [1st Dist.] 2013, no pet.).......... ..............................................................................................................37-38

*Slatton v. Brazoria County Prot. Servs. Unit*, 804 S.W.2d 550 (Tex. App.—Texarkana 1991, no writ) ...................................................................................................29, 34

*Texas Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531 (Tex.1987) ............32, 33, 35

*Vasquez v. Texas Dept. of Protective & Regulatory Services*, 190 S.W.3d 189 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ........................................................35

*Walker v. Texas Dept. of Family & Protective Services*, 312 S.W.3d 608 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ..................................................................35

## **STATUTES**

Tex. Fam. Code Ann. § 101.007 (West 2008) ........................................................31

Tex. Fam. Code Ann. § 161.001 (West 2008) ................................24, 25, 32, 46, 47

Tex. Fam. Code Ann. § 161.004 (West 2008) ................................. 19-20, 25, 26, 34

Tex. Fam. Code Ann. § 263.503 (West 2008) .................................................23, 47

## **RULES**

Tex. R. App. P. 33.1 ..............................................................................................34, 35

Tex. R. Civ. P. 71 ........................................................................................................27

Tex. R. Civ. P. 94 ........................................................................................................28

## REQUEST FOR ORAL ARGUMENT

The undersigned counsel is working toward meeting the requirements of becoming certified by the Texas Board of Legal Specialization in the practice of Civil Appellate Law. One of the requirements of becoming so certified is that an applicant present oral argument to an appellate court in at least four cases in the three years before presenting an application. Counsel has represented the Department in several appellate matters but has not yet had the opportunity to present oral argument. Undersigned counsel therefore asks that this request be granted so that he may have that opportunity.

## STATMEMENT OF THE CASE

This brief responds to the brief brought by the father (AJM) from two parental termination judgments rendered after a full bench trial involving three children. CR(IM)[1] 87, CR(AM/JM)[2] 55. On September 8, 2014, two separate judgments were signed that terminated the parental rights of the parents (JLD and AJM) to the subject children and appointed the Department as the children's sole managing conservator. *Id*. Per Tex. R. Civ. P. 306, the judgments recited that the parental rights of both parents were terminated because it was in the children's best interest and based on Texas Family Code §161.001(1)(E), and (O). CR(IM) 90; CR(AM/JM) 57-58. Both judgments further recited that the Department was named sole managing conservator, because appointment of a parent as conservator would significantly impair the children's physical health and emotional development and it would not be in the children's best interest. CR(IM) 90; CR(AM/JM) 58. The father (AJM) filed timely notices of appeal in both cases. CR(IM) 114, CR(AM/JM) 83. No motion for new trial was filed.

---

[1] "CR(IM)" refers to the Clerk's Record from cause no. 2013-04476J concerning the child (IM) and assigned 01-14-00801-CV in this court. The number following this abbreviation is the page where the document referenced appears.

[2] "CR(AM/JM)" refers to the Clerk's Record from cause no. 2011-00219J concerning the children (AM & JM) and assigned 01-14-00798-CV in this court. The number following this abbreviation is the page where the document referenced appears.

## REPLY POINT ONE

**There was legally and factually sufficient evidence to support the court's predicate findings for termination of the appellant's parental rights.**

## REPLY POINT TWO

**Though review of this ground is unnecessary, there was sufficient evidence to support the trial court's termination of the Appellant Father's parental rights under subsection (O)**

_____

**IN THE COURT OF APPEALS
FOR THE FIRST JUDICIAL DISTRICT
OF TEXAS AT HOUSTON**

_____

**IN THE INTEREST OF
I.M., A.M. and J.M., Children**

_____

**A.J.M. Appellant**

**v.**

**DEPARTMENT OF FAMILY & PROTECTIVE SERVICES, Appellee**

_____

**APPEALED FROM THE 314ᵗʰ DISTRICT COURT OF HARRIS COUNTY,
TEXAS, Trial Cause Nos. 2013-04476J, and 2011-00219J**

_____


_____

**APPELLEE'S  BRIEF**


TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:

Department of Family & Protective Services, Appellee, [hereinafter "Department"] submits this brief in response to the Appellant Brief.

**<u>STATEMENT  OF  FACTS</u>**

In 1993, when AJM was about 18 years old, he was arrested for manufacturing and delivering a controlled substance and was sentenced to 3 years

in county jail. RR-8(1)[3] p. 13 (see February 12, 1993 note); RR-8(1) p. 8 (AJM born 6/7/75). In 1995, AJM was arrested for evading arrest or detention and was sentenced to 15 days in jail. RR-8(1) p. 13. In 1996, AJM was arrested for possession of controlled substance and sentenced to 7 months in jail. *Id.* In 1998, AJM was arrested again for possession of a controlled substance and sentenced to 40 days confinement. *Id.* In 1999, AJM was arrested for manufacturing and delivering a controlled substance and was sentenced to 15 months in state jail. RR-8(1) p. 13; RR-8(4) p. 55 and 60. In 2001, AJM was arrested for manufacturing and delivering a controlled substance and sentenced to 2 years confinement. RR-8(1) p. 13; RR-8(4) p. 66.

In 2003, when JLD was about 18 years old, she began a relationship with AJM. RR-8(1) p. 10 (in 2010 stated she had been with him for 7 years); RR-8(1) p. 8 (JLD born 2/13/85). That same year, she was convicted and sentenced to 20 days for possession of marijuana and failure to identify. RR-8(1) p. 12; RR-8(4) p. 19. Later that same year, JLD was arrested for prostitution, and convicted and sentenced to 30 days. RR-8 p. 12; RR-8(4) p. 22. A few months later, in 2004, JLD was arrested for prostitution again and sentenced to 45 days in jail. RR-8(1) p.

---

[3] In this brief, "RR-8(1)" refers to 1st part of the 8th volume of the reporter's record titled, "Exhibits Part 1 of 6 Nos. P1 – P15" that the court reporter filed with this court under No. 01-14-00801-CV. There are six parts of the reporter's 8th volume under No. 01-14-00801-CV and these six parts of volume 8 will be referenced in this brief as RR-8(1), RR-8(2), RR-8(3), RR-8(4), RR-8(5) and RR-8(6). This court may take judicial notice that the exhibits and testimony from the trial that are reported for No. 01-14-00801-CV are also included in the record for 01-14-00798-CV since these cases were tried together. As they are identical, this brief will only reference the documents from the record in No. 01-14-00801-CV.

12; RR-8(4) p. 25. Later that same year, JLD was arrested again for possession of controlled substance and convicted and sentenced to serve one year in jail. RR-8(1) p. 12. In 2005, AJM was arrested for possession of marijuana and sentenced to 30 days confinement. RR-8 p. 13; RR-8(4) p. 71.

The next year, JLD and AJM had their first child (AM) at the end of 2006. RR-8(1) p. 18. A few months before the birth of their second child (JM) in 2008, AJM was arrested for theft and sentenced to 20 days. RR-8(1) p. 13; RR-8(4) p. 76. After the birth of JM in 2008, a referral was received by the Department because JLD tested positive for marijuana at the time of JM's birth. RR-8(1) p. 12. The Department sent the case to Strengthening Families, which accepted the referral, but the case was later closed because the family refused services. RR-8(1) p. 12.

About a month after the birth of their second child, AJM was arrested for possession of marijuana and failure to identify a fugitive from justice and was sentenced to 40 days. RR-8(1) p. 13; RR-8(4) p. 81 & 86. The child's grandmother, Sandra Dixon, was convicted for possession of cocaine on November 19, 2008. RR-8(5) p. 66. In 2010, AJM was arrested for assault causing bodily injury to a family member and was sentenced to 30 days. RR-8(1) p. 13; RR-8(4) p. 91.

A few months later, on September 21, 2010, the Department received a referral claiming that both AJM and JLD were drug users, the mother had a history

of using Xanax and it was believed she may be snorting cocaine. RR-8(1) p. 8. It was further alleged that the parents engaged in violent altercations in which the mother pulled a knife on the father and they hit each other. RR-8(1) p. 8. Moreover, the children have been knocked down and pushed out of the way while the parents were fighting. RR-8(1) p. 8. The referral went on to state that the mother repeatedly hit the children when she was angry. *Id*.

Several attempts were made by the Department to locate the family and by November, the Department worker was told the mother was in jail and the father and children moved. RR-8(1) p. 9. The next month, another referral was received by the Department that advised the parents had moved to a new apartment and the apartment had no food, except for crackers, the children were skinny, were seen outside with just shirts and pampers and on one occasion without any clothes on. RR-8(1) p. 9. The reporter stated that the neighbors complained of verbal arguments and the mother could be heard crying. *Id*. The reporter went on to state the parents had been evicted. *Id*.

Upon locating the parents' residence in December of 2011, the Department made an attempt to meet them but there was no answer and the worker left a card. RR-8(1) p. 10. However, AJM called the worker soon thereafter, said she just missed them and invited her to come to the apartment. *Id*. Upon finally placing eyes on the home, the worker confirmed the kitchen did not have food, the stove

did not appear to work and the refrigerator was dirty with mold inside and outside. *Id.*

The father stated the allegations were all lies, and the case was "bullshit." *Id.* He told the worker if he wanted his kids, she could "take them." *Id.* The mother was crying at the time, and told him to stop talking that way. *Id.* The worker called law enforcement who came to assist the worker after the father's voice elevated and he began yelling. *Id.*

Upon further interview, the mother confirmed she had been with AJM for almost 7 years and he was the father of her two children. RR-8(1) p. 10. The mother admitted that her first CPS case was when she tested positive at the birth of JM in 2008. RR-8(1) p. 11. She stated the case was closed and no one contacted her. *Id.* She stated she was not using drugs at that time and had not used since she was a teenager. *Id.* However, after she began to cry she admitted she smoked marijuana the last week on Christmas Eve. *Id.*

The mother admitted her 2009 assault case on her criminal record was due to slapping AJM. RR-8(1) p. 11. She stated her prostitution charges were the result of her prostituting out a club where she used to work. *Id.* She admitted she had just been incarcerated due to a DWI and had been in jail almost two weeks. RR-8(1) p. 10; RR-8(4) p. 30 (DWI committed 11/7/10).

AJM admitted he smoked marijuana in the last month as well but stated he did not use daily and was willing to quit. RR-8(1) p. 11. He admitted his assault to family member on his criminal record from 2002 resulted because police thought he hit JLD – but he claimed he did not. *Id*. He also claimed he did not know JLD used drugs. *Id*.

The worker later returned to the apartment on December 31, 2010 to perform a drug test on the parents. RR-8(1) p. 12. The worker received the drug results on January 10, 2011, which indicated both parents tested positive for marijuana. *Id*. The next day the worker spoke with AJM on the phone and told him the results of the tests. *Id*. He said they were planning on moving, but he did not know where. *Id*.

On January 12, 2011, the Department requested that it be named temporary managing conservator of AM and JM. RR-8(1) p. 14. On September 4, 2011, JLD committed a theft by check and later pled guilty. RR-8(4) p. 37. Before the end of that year, they had their third child (IM). RR-8(1) p. 42. This child tested positive for marijuana at the hospital, the mother's hair follicle tested positive for marijuana, and AJM's hair also tested positive for marijuana and cocaine. RR-8(1) p. 42 and p. 43. An affidavit was prepared and signed by the Department requesting emergency custody of IM as well because of the parents' ongoing drug use despite their involvement with services in association with their open CPS case

regarding AM and JM. RR-8(1) p. 46. On January 13, 2012, the Department was named temporary managing conservator of IM. RR-8(5) p. 14.[4]

Within three months, on March 27, 2012, the court signed a final judgment in the case involving IM's older siblings that appointed the Department as the permanent managing conservator upon finding that appointment of either parent would significantly impair the children's health or emotional development and would not be in their best interest. RR-8(1) p. 18-19. The order further required JLD to pay $278.20 a month in child support for the children. RR-8(1) p. 28.

A few months later, in December of 2012, a final judgment was signed in the case involving the child IM and the court appointed "Pearline Myrick" as the sole managing conservator of IM upon finding the appointment of a parent would be not be in the child's best interest because the appointment would significantly impair the child's physical or emotional health. RR-8(1) p. 50 and RR-8(5) p. 19. AJM was ordered to pay Ms. Myrick $285.30 a month for the support of that child. RR-8(1) p. 63.

The next year on May 23, 2013, JLD committed the crime of prostitution and was later convicted on her guilty plea. RR-8(4) p. 43. On July 24, 2013, the Department received a report of neglectful supervision of IM. RR-8(1) p. 71. It was reported that IM was back in the care of his mother and father, even though he

---

[4] Though this temporary order was not included in the record, this court may presume the trial court took judicial notice of its own order granting temporary managing conservatorship. *In re R.M.S.*, No. 01-13-00331-CV, 2013 WL 5637703 *4 n. 1 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

had been removed from their care in the prior order. RR-8(1) p. 71. Pearline, who was then 67 years of age, had a stroke and claimed she allowed them to have unsupervised access to the child because of her health condition. RR-8(1) p. 71. She stated she was better and could take care of the child, therefore, the child was placed back with her subject to a safety plan in which she agreed the parents would not have contact with the child. *Id.* However, the Department investigated further and determined Pearline could have placed the children with relatives other than the parents when she became ill, and other family members knew the child was with the parents. *Id.* The Department requested temporary managing conservatorship of the child and the court granted that request. RR-8(1) p. 80.

On August 20, 2013, drug testing was done of JLD and AJM on hair specimens and they showed positive results for cocaine. RR-8(2) p. 32; RR-8(3) p. 49. On August 20, 2013, the court ordered both JLD and AJM to comply with each requirement in the Department's service plan and notified them that failure to fully comply could result in restriction or termination of parental rights. RR-8(1) p. 86. However, not long after that order was signed, on August 29, 2013, JLD committed a crime involving possession of marijuana and was subsequently convicted on her guilty plea. RR-8(4) p. 49.

On October 8, 2013, both parents signed their service plans and the court approved and ordered the incorporation of the service plans filed with the court as

part of the court's order. RR-8 p. 93-95, 98-112. On October 8, 2013, drug reports indicated JLD and AJM tested positive for cocaine and marijuana on a hair specimen source. RR-8(2) p. 47-47; and RR-8(3) p. 57. On February 4, 2014, AJM tested positive for cocaine on a hair specimen source. RR-8(3) p. 76.

On July 15, 2014, Child Advocate's prepared a report for a permanency hearing. RR-8(5) p. 13. The report noted that IM had been placed with his paternal grandmother who was granted permanent managing conservatorship but she suffered a second stroke that required hospitalization. RR-8(5) p. 14. IM was placed with his brother and other foster children. Id. The foster mother disclosed an interest in adopting IM and his siblings. Id.

Trial proceeded the following year on August 21, 2014. The first witness was Bruce Jeffries, owner of National Screening Services. RR-7[5] p. 7. He stated he has been involved in the review of results for over 21 years and has met with the doctors, scientists and FDA. RR-7 p. 7. Petitioner's Exhibits 16 and 17 were admitted as part of his business records, over an objection that he was not an expert. RR-7 p. 10-11.

Jefferies then continued to testify regarding the testing and no objections were lodged. *Id.* He stated the first time they saw JD was on January 25, 2011 and

_____

[5] RR-7 is the 7th Volume of the Reporter's Record filed with this court under No. 01-14-00801-CV. The same record is filed under cause no. 01-14-00798-CV but is designated as Volume 3 of 8 Volumes under 01-14-00798-CV. The testimony of Bruce Jeffries in that record begins on page 6. This court may take judicial notice that the testimony of Bruce Jeffries under both 01-14-00798-CV and 01-14-00801-CV are identical. Because the records are identical, this brief will only reference the record of No. 01-14-00801-CV.

they ran a urine test that picked up Xanax and marijuana. RR-7 p. 11. He stated if she had a prescription for Xanax she would have been clear because the levels found in JLD's system were consistent with a therapeutic dose of the drug. RR-7 p. 11. He stated that the marijuana was fairly high. RR-7 p. 11. He stated the same day they ran an in ingestion hair test and the results indicated cocaine was found ingested. RR-7 p. 11. He commented that "she does not do it on a daily basis;" however, and all you could say is that she did it more than one time. RR-7 p. 11-12.

Bruce stated JD was seen again on November 4, 2011 and they ran a different test. RR-7 p. 12. At that time they ran a zero tolerance exposure test and found marijuana on the outside of her hair, and though her marijuana use dropped, the test still showed a high level of the drug in her system. RR-7 p. 12-13.

Jefferies stated the next time JLD was tested was on January 24, 2012 and they were asked to run a urine test. RR-7 p. 13. The marijuana went up to a level which showed heavy use. RR-7 p. 13. Also, Xanax appeared again. RR-7 p. 13. He commented: "If she has a prescription, it is therapeutic levels." RR-7 p. 13. He noted, however, that their records did not reflect a prescription and she did not show them one. RR-7 p. 14-15. Jefferies stated they also did a hair test but could not get a result either positive or negative. RR-7 p. 15. Jefferies stated they ran

ingestion tests following that in March, May and September of 2102 and did not find anything in her hair. RR-7 p. 16.

On March 15, 2013, they ran a zero tolerance exposure test and nothing was picked up on the outside of her hair. RR-7 p. 16. Only a very low level of cocaine was picked up on the inside of her hair. RR-7 p. 16. It indicated a one time use that would have been a new use. RR-7 p. 17. Two months later, on May 17, 2013, they ran another zero tolerance exposure test and did not pick up anything on the inside or outside of her hair samples. RR-7, p. 17.

Nevertheless, on September 20, 2013, they were asked to run a K2 test involving synthetic marijuana. RR-7 p. 19. K2 was detected in her urine. RR-7 p. 19. Also, an extended opiate hair test was performed that date showed positive for a metabolite of cocaine in her hair. RR-7 p. 19. They were then asked to run an exposure and ingestion test on that date and found ingestion of cocaine as well as marijuana exposure on the outside of the hair. RR-7 p. 19.

On October 8, 2013, an extended opiate urine test was run and no metabolites were found in her urine. RR-7 p. 19. However, the zero tolerance hair test and extended opiate hair test taken on that date both came back positive for cocaine. RR-7 p. 19. The extended opiate urine test and zero tolerance exposure tests taken in March 2014 found no metabolites and she was clean. RR-7 p. 20. Overall, Bruce stated it looked like her drug of choice at the beginning was Xanax

and marijuana. RR-7 p. 20. She got off the marijuana but the cocaine seemed to come back intermittently into the picture. RR-7 p. 20-21.

Moving to P-17 involving AJM, Jefferies stated the first time he saw AJM was on January 25, 2011. RR-7 p. 22. They ran a urine test that picked up Xanax at therapeutic levels and marijuana at levels consistent with a chronic user of the drug. RR-7 p. 22. The ingestion hair test also reinforced the high level finding concerning marijuana, and cocaine was detected, but not at the same chronic levels. RR-7 p. 22. The test on November 5, 2011 performed ten months later was a zero tolerance test. RR-7 p. 22-23. It picked up cocaine indicating the level went up to more than a one-time use. RR-7 p. 23.

On January 24, 2012 the ingestion hair test showed cocaine and marijuana levels and on March 13, 2012, the urinalysis showed a level that indicated heavy use. RR- p. 23. In May of 2012, the ingestion hair test came back positive for cocaine. RR-7 p. 25-26. The ingestion hear test on September 4, 2012 also showed positive for cocaine. RR-7 p. 26. On March 15, 2013 a zero tolerance test found nothing on the outside but was positive for cocaine ingestion. RR-7 p. 27. Two months later, there was a clear urinalysis and nothing showed on the zero tolerance test. RR-7 p. 27. On August 20, 2013, they were asked to run an ingestion test and it showed positive for cocaine, but not for marijuana. RR-7 p. 28. Rather, the marijuana was only on the outside of the hair sample. RR-7 p. 28. On October 1,

2013, a hair ingestion test showed positive for cocaine and marijuana. RR-7 p. 28. A week later the extended opiate urine test was clean. RR-7 p. 28. However, some cocaine was detected. RR-7 p. 28-29. On February 4, 2014 nothing was detected on AJM's opiate urine test. RR-7 p. 29. However, some cocaine levels were found on the ingestion hair test. RR-7 p. 29. Jefferies stated these tests showed that he used cocaine more than once but he was not a daily user. RR-7 p. 30.

Jefferies confirmed that AJM used drugs in the 10 month period following January 25, 2011. RR-7 p. 33. Also, he did not remain drug free from January 2012 to September 2012. RR-7 p. 34. The tests also indicate he did not remain drug free in 2013 and had several positives. RR-7 p. 35-36.

The next witness was the caseworker, Jasmine Green. RR-7 p. 73. She stated that she was the caseworker for all three children. RR-7 p. 73. She stated AM is 7, JM is 5 and IM is 2, and they are all placed together in a private agency foster family home. RR-7 p. 73. The foster home is willing to adopt the children. RR-7 p. 73.

Green stated that the original case was 2011. RR-7 p. 74. She stated the substantial material changes since then that caused the State to file a motion to modify as to AM and JM had to do with the parents making no progress since the decree was entered. RR-7 p. 74. The agency tried to work with the parents to possibly place the children back in their home but both parents continued to test

positive for drugs. RR-7 p. 75. As for the youngest, IM, he was placed with the grandmother, but in June 2013, the Department was informed that she had a stroke, and a volunteer told Green that the child was with the parents. RR-3 p. 78-79 and p. 81. The Department was given temporary managing conservatorship and placed with Ms. Myrick, but in March the child came to live with the siblings because Ms. Myrick continued to have health problems. RR-7 p. 84. The youngest child has remained with his siblings since March 29, 2014. RR-7 p. 86. Green noted that since being placed in his foster home, IM made dramatic improvement. RR-7 p. 86-87. The older siblings bonded with the caregiver and are doing very well. RR-7 p. 87.

Green stated that new family plans of service were created for both parents on September 6, 2013 and they signed them. RR-7 p. 76. They were both together at the time. RR-7 p. 77. Their plans were the same except that AJM was required to complete anger management. RR-7 p. 77. Otherwise, the plans required them to provide proof of income, safe and stable housing, participate in parenting education classes, maintain a drug-free environment, maintain contact with the agency, complete a drug and alcohol assessment, complete random drug testing, complete individual and group counseling, and complete a psychosocial evaluation. RR-7 p. 76.

Green stated that neither parent completed their family services on their new family service plans and continued to engage in conduct that endangered their children, including drug use and criminal activity. RR-7 p. 90. In particular, the children's mother was convicted of prostitution for an arrest on May 23, 2013. RR-7 p. 90. She had two earlier convictions in September 2003 and January of 2004. RR-7 p. 91. She also was convicted of possession of marijuana in September of 2013. RR-7 p. 114.

Green stated that the parents visited after the earlier decree since 2012 but were not paying child support. RR-7 p. 93. Nevertheless, after May of 2013 they attended visits less frequently and during the summer months of May and September 2013 they were not visiting at all. RR-7 p. 94-95. The older children responded to their lack of visits by being angry and not wanting to see the parents. RR-7 p. 96. Jasmine stated that the children know who their father is but now they do not ask to see him. RR-7 p. 105.

Jasmine stated that the mother completed a drug program in October 2012 but she continued to test positive for drugs after that. RR-7 p. 98. She did not complete any programs for drugs after the initial program. RR-7 p. 98. The father also completed court ordered services regarding drugs in September 2012, but he too continued to test positive for illegal drugs after that time. RR-7 p. 98.

The next witness to testify was Quana Smith, an Advocacy Coordinator from Child Advocates. RR-7 p. 115. She stated that Child Advocates has been involved in this case since October of 2013. RR-7 p. 115. She stated they were only appointed in IM's case. RR-7 p. 118. Nonetheless, she stated that Child Advocates believed it was in the best interest of the children that the parental rights of their parents be terminated. RR-7 p. 116. She stated that was their recommendation because neither parent proved they could provide a safe, stable environment, both parents continued to test positive for drugs, made poor parenting decisions, and had no contact with the children. RR-7 p. 116-17.

The next witness was Sandra Dixon, the maternal grandmother. RR-7 p. 119-20. She stated she was a journeyman and carpenter/builder. RR-7 p. 120. She stated she has a 17 year old child in her home looking for a job and starting 11th grade at Austin Middle School. RR-7 p. 120. She asked Ms. Green to do a home study of her home regarding the grandchildren but was told her supervisor did not want to look at her. RR-7 p. 124-25. She commented she guessed she had a CPS referral for one child that ran way. RR-7 p. 125. She had been gone a week and she reported her as a runaway. RR-7 p. 125. She stated when they found her and they knocked on her door, she was out of town so they placed with JLD. RR-7 p. 126.

She stated there was another incident 17 years earlier where her twins, then 18 months old, went out and some neighbor brought them back. RR-7 p. 127-28.

She admitted she had some criminal history involving a felony for recreational cocaine use about five years before. RR- 7 p. 129. She stated she also had a second drug charge also involving cocaine that was a revocation of her probation and got 4 years deferred adjudication in 2008. RR-7 p. 129-30. She also had a DWI in 1999 or 2000. RR-7 p. 136. She stated she was charged with assault of a family member in 2011 but it was dismissed. RR-7 p. 140-41. It involved her daughter Leslie and that was why CPS got involved. RR-7 p. 142.

She stated she was the one who made the initial call on JLD and AJM for their children because of the violence in their home. RR-7 p. 131. She admitted she had not seen AM and JM since October of 2012. RR-7 p. 144.

The mother, JLD, stated the child's grandmother who had her son IM in care and was conservator was Pearline Myrick. RR-7 p. 150. She stated that Pearline lives with her. RR-7 p. 151. She stated she told her she was going to court but was unaware it was trial. RR-7 p. 151. She stated she has been clean since March 2011 and does not know why the drug tests were coming up like that except for her hair. RR-7 p. 156. She then stated she was clean through 2012 and commented she guessed she started testing positive a little bit after that. RR-7 p. 156-57.

The final witness, the father (AJM) stated the last time he had a visit with his children was a year before when he had a November visit. RR-7 p. 158. He stated it had not been easy for him to communicate with CPS and he claimed CPS failed

to return calls several times. RR-7 p. 159. He also claimed he showed up for visits and the children were not made available several times. RR-7 p. 159.

He stated his mother had a stroke and that was why he was watching IM. RR-7 p. 160. He stated he had him maybe a week before CPS took him. RR-7 p. 161. He commented that his mom raised him and his dad was never around. RR-7 p. 164. He stated he had been to court like 50 times. RR-7 p. 162. The court commented he had not had 50 hearings. RR-7 p. 162.

AJM stated since May 2013, CPS separated him from his kids, because his mom had a stroke. RR-7 p. 163. He stated he was working every day and since completed his services and has a better job working more hours. RR-7 p. 163. He indicated he was working temporary when he completed services. RR-3 p. 163.

Following closing arguments, the court granted the Department's request to terminate the parents' rights, and signed the final orders in each case on September 8, 2014. RR-7 p.172-73. AJM timely filed notice of appeal on September 26, 2014.

## SUMMARY OF ARGUMENT

In this appeal, the Appellant Father presents multiple issues for review, including contests that the trial court lacked legally and factually sufficient evidence to support its termination of his parental rights under subsections (E) and (O) of the Texas Family Code. As a preliminary matter, however, his brief

contends that the trial court erred when it considered certain evidence of facts that occurred prior to decrees entered as to the appellant and his children in 2012. His argument is that the Department failed to include a reference to section 161.004 in its pleadings, and as this statute is the only method through which the trial court could consider evidence from before the 2012 decrees, the court committed error by reviewing such evidence.

The record reveals that this argument should fail. While the Department's pleadings do not contain the statutory reference to section 161.004, it properly pled the elements necessary to meet the requirements of that section. Namely, the Department included in its petition the allegations that the circumstances of the children had changed, AJL committed acts sufficient to show conduct described by Section 161.001 before date of the 2012 decrees, and that termination of AJM's parental rights was in the children's best interest. *See* Tex. Fam. Code Ann. §161.004 (West 2008). In support, the Department included with its petitions affidavits outlining AJM's extensive history involving criminal conduct, illegal drug use, and violent altercations that occurred prior to 2012. The Department's petitions therefore met the requirements of the rules of civil procedure regarding adequate pleadings in that they plainly provided fair and adequate notice to AJM of the bases of the Department's claims. Moreover, at no time during the proceedings below did any party register a complaint, objection, or file special exceptions

regarding the Department's pleadings. In fact, at trial, the father's own attorney elicited testimony regarding facts that occurred prior to 2012. As a consequence, not only does the record affirmatively disprove the Appellant's claim under this point, but is should be considered waived as it was never made in the trial court below.

The appellant's contentions with regard to the sufficiency of the evidence should also fail. Even assuming, without conceding, that the scope of the evidence available for review should be limited to facts which occurred after 2012, the facts show that AJM engaged in conduct endangering to his children throughout his children's lives, including before and after they were placed in the Department's custody, as well as after the 2012 decrees were entered. Thus, the arguments in AJM's brief that there was insufficient evidence to support the trial court's subsection (E) ground finding should fail.

In brief summary, the evidence supporting the court's endangerment finding was as follows. Beginning in 1993 and continuing after his children were born and while they were in the Department's care, AJM was involved in a lengthy list of criminal conduct, most of which involved illegal drugs. Between 1993 and 2006, when AM was born, he was convicted nine times of crimes involving the manufacture, possession and delivery of controlled substances, as well as other crimes involving evading arrest, and discharge or display of a firearm. After AM

was born, he was convicted of a theft charge, and after his second child JM was born, he was convicted of drug possession and assault of a family member. In accordance with case law analyzing evidence supportive of an endangerment finding, this evidence showed that AJM repeatedly exposed his children to a life of uncertainty and instability, as well as to his absence from their lives and consequent inability to support them.

The evidence further shows that AJM continued in this conduct even after the Department became involved with his family and removed his children from his care. In September of 2011, the record shows the Department received a referral from the children's maternal grandmother stating that the parents were drug users who engaged in violent altercations in front of the children during which the children were knocked down or pushed out of the way while the parents were fighting. Moreover, the grandmother's report stated that both children had been physically abused by both parents and that JM had whip marks on his back and AM had a gash on her forehead which were caused by AJM. As the cases progressed, AJM was provided numerous family service plans affording him the opportunity on several occasions to remediate his conduct. However, the record shows that rather than engage in these services, he persistently used illegal drugs over the course of the three years that his children were removed from his care, including after the 2012 decrees were entered. In 2011, AJM tested positive for

cocaine and marijuana January and November, one month before IM was born in December of 2011. In 2012, he tested positive for cocaine and marijuana in January and March, and cocaine in May and September. In 2013, he tested positive for cocaine in March, August and October, and then finally tested positive for cocaine and marijuana in February of 2014, the same year this case went to trial. The Department's caseworker testified regarding AJM's drug use that it persisted regardless of the numerous attempts the Department made to provide AJM with services, and it was her belief that returning the children to his care would subject them to substantial danger and exposure to his substance abuse. This evidence was sufficient for the trial court to form a firm belief or conviction that AJM engaged in a voluntary course of conduct endangering to his children's well-being in support of its subsection (E) finding. The arguments in AJM's brief to the contrary should be overruled.

As the evidence was sufficient to support the court's (E) ground finding, this court need not review the contentions in AJM's brief with regard to subsection (O). Nonetheless, if such a review is necessary, there was sufficient evidence in support of this finding as well. Under this point, AJM's brief does not contend that he failed to comply with the provisions of a court order specifying the tasks necessary for him to obtain the return of his children, or that they were in the Department's care for greater than nine months as required by this ground. Rather, his sole

contention is that there was insufficient proof that his children were removed under Chapter 262 for abuse or neglect. The record reveals otherwise.

As made clear by the Texas Supreme Court as well as the Texas Family Code, a removal under Chapter 262 for abuse or neglect includes one in which a parent, "endangered [a child's] physical health or safety, such that initial *and continued* removal are appropriate". *In re. E.C.R.*, 402 S.W.3d 239, 245 (Tex. 2013) (emphasis added). This language reflects the dictates of several provisions in the Texas Family Code which supply that, even after an initial removal, a court must reassess at later statutory hearings whether to continue that removal while a child is in the Department's care. *See* Tex. Fam. Code Ann. §263.503(a)(9) (West Supp. 2013). In fact, under these provisions, a court must hold regular placement review hearings even after a final order is entered naming the Department conservator at which it must determine whether returning a child to the parent is appropriate. *See* Id. In this case, the evidence supported that the initial removal was supported by sufficient evidence, and that even after the court entered its judgments in 2012, continued removal was appropriate given that the parents persisted in criminal conduct and drug use. In short, the evidence supporting the initial removal was the parents' lengthy history of criminal conduct involving drugs, as well as the allegations in the Department's affidavits indicating the parents were involved in violent altercations, including the physical abuse of their

children. The record shows that, throughout the time the children were removed from their parents, the parents continued to engage in criminal behavior and drug use, indicating returning the children to their care would subject the children to further harm. Thus, the trial court's initial and continued removal of the children from the parents' care under 262 was amply supported and AJM's arguments under this point should be overruled.

## ARGUMENT AND AUTHORITIES

**REPLY POINT: There was legally and factually sufficient evidence to support the court's predicate findings for termination of the appellant's parental rights.**

### 1. Applicable Law, and Scope of Review

Section 161.001 of the Family Code was the statutory basis by which the Department sought termination of parental rights in both cases at issue in the two subject appeals. Tex. Fam. Code Ann. §161.001 (West 2008). CR(IM) 11-17; CR(AM/ JM) 34-41. Section 161.001 of the Family Code authorizes termination of parental rights on a finding by clear and convincing evidence that (1) the parent committed at least one of several predicate acts or omissions listed under section 161.001(1) of the Family Code and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. §161.001 (West 2008).

Both cases in this appeal were tried together and included in their decree, as required by Tex. R. Civ. P. 306, references to Section 161.001 of the Family Code

as the basis for the court's parental termination decisions. CR(IM) 89-90; CR(AM/JM) 57-58. In particular, the decrees recited that the court found parental termination was in the children's best interest and that AJM committed at least one of the predicate acts listed in Section 161.001(1); specifically Subsections E and O. *Id.*

Section 161.004 permitted the Department to request parental termination under Section 161.001 for facts prior to the 2012 decrees upon certain proof. *See* Tex. Fam. Code Ann. §161.004 (West 2008). Consistent with that request, the Department's pleadings recited the proof requirements of Section 161.004 of the Family Code by acknowledging prior orders had been signed for the children, that the "circumstances of the children, a conservator, or other party affected by the order have materially and substantially changed since the date of the rendition of the order" and that orders for modification of managing conservatorship are in the best interest of the children. CR(IM) at pp. 33, 34, 38; CR(AM/JM) p. 30, 33; *See* Tex. Fam. Code Ann. §161.004 (West 2008). Moreover, it is clear that both suits were not limiting their claims to proof after 2012, because both suits began with requests for emergency relief relying, in part, on affidavits that detailed endangering conduct of the parents involving illegal drug use and violent altercations that occurred prior to the 2012 judgments. CR(IM) at p. 20; CR(AM/JM) at p. 24-25.

Acknowledging that the Department's allegations of facts under Section 161.004 of the Family Code were proven with evidence at trial, the court's decrees in both cases stated: "some of the evidence considered in this trial related to events occurring before a prior order denying termination, and that such evidence was admissible pursuant to § 161.004, Texas Family Code." CR(AM/JM) at 57; CR (IM) at 89. Nevertheless, Appellant's Brief essentially claims this was error and the court's scope of review should have been limited to evidence of facts occurring after the 2012 decrees because Section 161.004 was not pled. This analysis is incorrect.

First, the elements of Section 161.004 of the Family Code were pled. That the words "Section 161.004" were not stated in the Department's petitions did not mean AJM was not given fair notice of the application of this law. All that is required under the rules of procedure for application of the law in a case is that the respondent be given fair and adequate notice of the facts upon which the pleader bases a claim. *Horizon/CMS Healthcare Corp. v. Aula*, 34 S.W.3d 887, 897 (Tex. 2000). This clearly was done. Consistent with all the elements of proof under Section 161.004, both suits referenced the prior 2012 decrees subject to modification, alleged material and substantial change in circumstances, claimed parental termination under Section 161.001, and alleged it was in the children's best interest for the prior decisions to be modified. CR(AM/JM) at pp. 30, 33, 34-

44; CR (IM) at pp. 33, 34, 38, 39-45; See Tex. Fam. Code Ann. §161.004 (West 2008).

Moreover, no claim was raised in the trial court that Section 161.004 was not properly pled and no special exceptions were filed asserting any uncertainty regarding the relief the Department was seeking, or the scope of the evidence on which the Department intended to rely. When a party fails to specifically except to pleadings, a court should construe the pleadings liberally in favor of the pleader. *Boyles v. Kerr*, 855 S.W.2d 593, 601 (Tex. 1993). A court should uphold the petition as to a cause of action that may be reasonably inferred from what is stated, even if an element of the cause of action is not specifically alleged. *Id.* Also, even if it could be claimed the Department mistakenly drafted its claims (which does not appear to be the case), Tex. R. Civ. P. 71 permitted the court to treat the pleading as properly designated. Consequently, there does not appear to be any basis to accept the claim being suggested in Appellant's Brief.

In addition, the complaint in Appellant's Brief is more in the nature of a claim of *res judicata*. *See In re K.G.,* 350 S.W.3d 338, 346 (Tex. App.–Fort Worth 2011, pet. denied) (noting that Section 161.004 was enacted to permit prior evidence to be considered notwithstanding *res judicata*). The doctrine of *res judicata* holds that a final judgment in an action bars the parties from bringing a second suit on matters actually litigated as well as causes of actions or defenses

which arise out of the same subject matter and which might have been litigated in the first suit. *Compania Financiara Libano, S.A., v. Simmons*, 53 S.W.3d 365, 367 (Tex. 2001). The rules of procedure do not expressly require a party to plead whether evidence prior to an earlier judgment will be presented for relief requested. Nevertheless, a party who seeks to apply the defense of *res judicata* to bar relief based on prior facts must do so as an affirmative defense, which can be waived if not raised in the trial court. *See Hercules Offshore, Inc. v. Excel Crane & Hydraulics, Inc.*, No. 01-13-00817-CV, 2014 WL 6601644 (Tex. App. – Houston [1st Dist.] 2014, no pet.); See Tex. R. Civ. P. 94. However, there is nothing in the record indicating that *res judicata* was raised as a defense at any point during the proceedings below.

In both of these cases, while the Department clearly sought relief based, in part, on prior facts when it filed the instant suits and alleged elements of Section 161.004, no answer was filed by either parent asserting *res judicata,* nor was any relief requested on the basis of *res judicata* at trial. Consequently, the attempt at this point should be considered waived. *See Hercules Offshore, Inc. v. Excell Crane & Hydraulics, Inc.*, 2014 WL 6601644 *8; Tex. R. App. P. 33.1. That the claim should be barred as waived is particularly true considering the father's own attorney elicited testimony at trial concerning facts prior to the previous termination, and no objection was raised when the majority of evidence was

offered and admitted concerning the father's unfitness prior to the 2012 decree. *See* RR-7 (pp. 103-107); *See* RR-7 p. 72-73 (No objection to Petitioner's Exhibits P1 to P23); *See Slatton v. Brazoria County Prot. Servs. Unit*, 804 S.W.2d 550, 553 (Tex. App.—Texarkana 1991, no writ) (even though parent pled *res judicata*, because parent did not challenge admission of evidence prior to previous decree, the claim was waived); *See also In re K.G.,* 350 S.W.3d at 346.

Further, notwithstanding the obvious waiver of *res judicata* as a defense, Appellant's Brief claims the court erred in considering prior evidence under Section 161.004 because there was no proof of a material and substantial change in circumstance after the decrees in 2012 to invoke application of Section 161.004. As already stated, that claim was expressly waived since even Appellant presented evidence from prior to the 2012 decree and failed to object to relevant evidence that established proof of the father's inappropriate acts before and after the 2012 decrees. Nonetheless, the following evidence confirms there was a material and substantial change in circumstances in the situation of all the relevant parties since the 2012 decrees:

> 1. *Both parents committed inappropriate criminal and illegal drug activities after the 2012 decrees.* RR-7 p. 74-75 (despite efforts to try and reunify, parents continued to test positive for drugs); RR-8(4) p. 43 (mom convicted for prostitution in May 2013); RR-8(4) p. 49 (mom convicted marijuana possession).RR-8(2) p. 32 and RR-8(3) p. 49 (parents test positive for cocaine August 2013); RR-8(2) p. 47-47; and RR-8(3) p. 57 (October 8, 2013 drug reports indicated JLD and

AJM positive for cocaine and marijuana); RR-8(3) p. 76 (AJM tested positive for cocaine on hair specimen).

2. *Since the 2012 decrees, IM came back into parents' care because of health issues of named conservator though prior order removed the parents as conservators.* RR-8(1) p. 71; RR-8(5) p. 14 (Child Advocate report notes paternal grandmother who was conservator suffered second stroke);

3. *Since last decrees, children were placed together in foster home where foster parent disclosed interest in adopting them.* RR-8(5) p. 14. Youngest child observed to make dramatic improvements after move with siblings since March 29, 2014. RR-7 p. 86-87. Children observed bonded with caregiver and doing very well. RR-7 p. 87.

Consequently, the record disproves the claim in Appellant's Brief that the scope of evidence to be reviewed in support of the court's findings should be limited or that Section 161.004 had not application, not only because it was waived, but also because the record establishes otherwise.

2. **Standard of Review**

As far as the applicable standard of review, the standard for the court's findings under Section 161.001 requires consideration of the clear and convincing burden of proof at trial. *See In re C.H.,* 89 S.W.3d 17, 25 (Tex. 2002) ("burden of proof at trial necessarily affects appellate review of the evidence."); *In the Interest of J.F.C.,* 96 S.W.3d 256, 265-66 (Tex. 2002). In that connection, both legal and factual sufficiency challenges consider the standard of proof for clear and convincing evidence by considering whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the State's

allegations. *See In re C.H.*, 89 S.W.3d at p. 25 (Tex. 2002); *In re J.F.C.,* 96 S.W.3d at pp. 265-66; Tex. Fam. Code Ann. §101.007 (West 2008).

In *In re J.F.C.* the Supreme Court explained, in light of the identical inquiries made to the clear and convincing standard, the distinction between legal and factual sufficiency when the burden of proof is clear and convincing evidence may be a fine one in some cases, but clarified that there is a distinction in how the evidence is reviewed. 96 S.W.3d at p. 266. The court explained that in a legal sufficiency review, a court should look at all of the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true, giving appropriate deference to the trier of fact. Id. In a factual sufficiency review, a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing and with respect to disputed evidence, a court should consider whether the disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. Id. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. 96 S.W.3d at pp. 266-67.

**3. There was conclusive proof of the parents' pattern of endangering conduct under subsection (E) where it was undisputed that the**

**Appellant Father jeopardized his children by continuing in criminal activities, continuing in illegal drug activities, and failing to complete the Department's plan for reunification.**

The first predicate act challenged in Appellant's Brief's concerns the finding under Subsection E of Section 161.001(1) of the Family Code. Subsection (E) of Section 161.001(1) of the Family Code involves proof that the parent engaged in conduct endangering to a child, which is defined as exposing a child to loss or injury or jeopardizing a child's emotional or physical health. *Texas Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987); Tex. Fam. Code Ann. §161.001(1)(E) (West 2008).[6] As clarified by the Supreme Court, the proof for endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone. *Boyd,* 727 S.W.2d at p. 533. Also, it is not necessary that the parental misconduct be directed at the child, occur in the child's presence or that the child actually suffer injury from it; and it may include evidence of conduct before the child's birth as well as before and after the child has been removed by the Department. *See In re B.B.,* 971 S.W.2d 160, 166-69 (Tex. App.—Beaumont 1998, pet. denied).

In the present case, there was conclusive proof establishing that AJM jeopardized his children's emotional or physical well-being in support of the trial

---

[6] Specifically, Subsection (E) involves a finding that the parent: "engaged in conduct or knowingly placed the child with persons who engaged in conduct which **endangers the physical or emotional well-being of the child**." Tex. Fam. Code Ann. §161.001(1)(E) (Vernon 2008) (emphasis added).

court's finding under Subsection E. The record contains undisputed facts that showed AJM engaged in a pattern of behavior that subjected his children to an uncertain and insecure future, which jeopardized their basic need for permanence and stability. As such, the trier of fact had ample support from which to form a firm belief or conviction that AJM endangered his children under Subsection E. See *In re B.H.*, No. 01-10-00415—CV, 2011 WL 4501940 (Tex. App.—Houston [1st Dist.] 2011)(no pet.) (because children need stability and permanence, conduct that subjects a child to a life of uncertainty and instability endangers a child's physical and emotional well-being).

As a consequence, the arguments presented in AJM's brief should be overruled. As an initial matter, his brief first contends that the evidence available for review should be limited to those facts which occurred after March of 2012 as to AM and JM, and after December of 2012 as to IM because the Department failed to plead section 161.004 as a basis for relief in either of its petitions. *See* Tex. Fam. Code. Ann. §161.004 (West 2008); Appellant's Brief, p.33. As set forth above, however, the Department properly pled the proof required to support a claim under section 161.004 and any complaint to the contrary was waived because no party objected at any point during the proceedings below in order to preserve AJM's argument here. *See Slatton*, 804 S.W.2d at 553; Tex. R. App. P. 33.1.

Moreover, without conceding that the evidence should be limited to facts

occurring after the 2012 decrees, there was sufficient proof that AJM engaged in conduct endangering to his children throughout the entire time his children were in the Department's care, including after the 2012 decrees were entered. In the face of this evidence, AJM's brief asserts there was nothing showing that, through his conduct, he exposed his children to loss or injury or in any way jeopardized them. Appellant's Brief, p.33. His argument is that, because the children were in a foster home and only had contact with AJM at visits supervised by the Department, there can be no nexus showing how his drug use and criminal conduct endangered them. Id. However, this argument both fails to acknowledge the entirety of the evidence supporting the trial court's decree and misconstrues the standard courts apply to an endangerment finding. *See Boyd,* 727 S.W.2d 531, 533 (stating, "it is not necessary that the conduct be directed at the child, or that the child actually suffers injury."); *also Walker v. Texas Dept. of Family & Protective Services*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (stating endangerment may be inferred from parental misconduct even if the conduct is not directed at the child or occur in the child's presence, and such conduct may occur before the child's birth and both before and after the child has been removed by the Department.).

Contrary to the assertions in AJM's brief, the record here shows that AJM engaged in illegal conduct and drug use both before his children were born and

throughout their lives, including while the children were in the Department's care and his parental rights were at stake. *See In re G.A.*, 01-11-00565-CV, 2012 WL 1068630, at \*6 (Tex. App.—Houston [1st Dist.] Mar. 29, 2012, pet. denied) ("A parent's history of drug use or criminal conduct can show a pattern of conduct that subjects a child to an uncertain and unstable life, endangering the child's physical and emotional well-being."). Moreover, the evidence was he persisted in this conduct both before and after the 2012 decrees despite the Department's efforts to provide him with rehabilitative services. *See Vasquez v. Texas Dept. of Protective & Regulatory Services*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (noting that, "appellant's failure to remain drug-free while under TDPRS's supervision, knowing that such conduct could place [his] children, .. at risk," supported an endangerment finding.). Therefore, notwithstanding the arguments in AJM's brief regarding the application of section 161.004, the trial court plainly had sufficient evidence to support its conclusion that termination of AJM's parental rights was warranted under subsection (E).

The record contains the following support for the court's endangerment finding, much of which was uncontested. AJM's criminal records and drug test results show that he was involved in criminal conduct and illegal drugs for years leading up to the initiation of the suits involving his children, and that he persisted in that conduct throughout the time the children were in the Department's care.

*See* RR-8(1), P-Ex 3, pp.13-14; RR-8(3), P-Ex 17, pp.3-78; RR8(4), P-Ex 19, pp.53-98. In the years before AM's birth, AJM was arrested and convicted multiple times of several crimes, the majority of which involved illegal drugs. *See* RR-8(1), P-Ex 3, pp.13-14. The Department's affidavit, attached to the petition it filed on January 12, 2011, outlines that AJM was involved in the following:

- February 12, 1993: arrest and conviction for manufacturing and delivering a controlled substance, sentenced to 3 years.

- November 9, 1993: arrest for disorderly conduct involving the discharge or display of a firearm.

- January 19, 1995: arrest and conviction for evading arrest, sentenced to 15 days.

- August 9, 1996: arrest and conviction for possession of a controlled substance, sentenced to 7 months.

- December 12, 1998: arrest and conviction for possession of a controlled substance, sentenced to 40 days.

- March 23, 1999: arrest and conviction for manufacturing and delivering a controlled substance, sentenced to 15 months.

- January 5, 2001: arrest and conviction for manufacturing and delivering a controlled substance, sentenced to 2 years.

- July 9, 2004: arrest and conviction for evading arrest with a motor vehicle, sentenced to 6 months.

- March 27, 2005: arrest and conviction for possession of marijuana, sentenced to 30 days.

RR-8(1), P-Ex 3, pp.13-14; RR-8(4), P-Ex 19, pp.53-71.

Then, on December 16, 2006, AM was born. RR-8(1), P-Ex 3, p.9. Two years later, in March of 2008, AJM was convicted of theft and received 20 days' incarceration. RR-8(4), P-Ex 19, p.76. Nine months later, on December 16, 2008, JM was born, and just over a month later in January of 2009, AJM was again convicted of possession of marijuana and sentenced to serve 40 days in jail. RR-8(1), P-Ex 3, p.9; RR-8(4), P-Ex 19, p.81. Then in April of 2010, when his children were one and three years' of age, he was convicted of assault to a family member and received a sentence of 30 days. RR-8(4), P-Ex 19, p.91. This evidence supported that AJM had a lengthy history of committing crimes involving drugs, and subjected his children repeatedly to his absence from their lives. *See In re T.G.R.-M.*, 404 S.W.3d 7, 15 (Tex. App.—Houston [1st Dist.] 2013, no pet.) *citing In re. S.M.L.*, 171 S.W.3d 472, 479 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("incarcerated parent's absence from child's daily life and inability to support child are factors contributing to course of endangering conduct and that parent's repeated commission of criminal acts subjecting him to possibility of incarceration can negatively impact child's emotional well-being.").

That AJM endangered his children was further supported by the Department's investigation, initiated by a referral made in September of 2010 indicating that he neglected and physically abused his children. *See* RR-8(1), P-Ex 3, p.8. At trial, JLD's mother, Sandra Dixon, testified that it was she who made

this initial referral to the Department. RR 7, pp.130-131. According to the affidavit attached to the Department's January 12, 2011 petition:

> The referral stated that both parents are drug users and smoke marijuana on occasions [sic]. The mother has a history of using Xanax and may be currently snorting cocaine. The referral went on to state that the parents engage in violent altercations. The mother has pulled a knife on the father and they both hit each other. The referral stated that the children have been knocked down and pushed out of the way while the parents are fighting. The mother has violent fits of rage and will take it out on the children by striking them with objects in her hand. The referral went on to state that the mother will repeatedly hit the children when she is angry or raging. Recently, the referral stated, [JM] had whip marks across his back and [AM] had a gash across his forehead and reported that the father causes [sic] the injuries.

> RR-8(1), P-Ex 3, p.8.

During the course of the investigation that followed, the Department was able to interview both parents. *Id.* at 10. Initially, AJM did not allow the Department to speak to the children's mother alone. *Id.* He denied abusing his children and told the Department's investigative caseworker that the case was, "bullshit." *Id.* He also told the worker that if she wanted the children, she could take them. *Id.* Because AJM failed to cooperate with the worker and was yelling at her, she called law enforcement to aid her in carrying out her investigation. *Id.* In her subsequent interviews with the children's parents, JLD, their mother, stated she was recently arrested and jailed after being charged with a D.W.I. *Id.* at 11. She also said her first case with the Department was initiated after she tested positive for marijuana

when JM was born, but that the family refused to engage in services so the case was closed. *Id*. In addition, she admitted to criminal history involving an assault on AJM and prostitution, and both parents admitted to using marijuana and tested positive for marijuana on drug tests administered by the Department. *Id*. at 11-12. The Department subsequently filed its Original Petition for Protection, Conservatorship, and Termination as to AM and JM, in which it requested to take possession of the children. CR-798, p.3. This evidence supported that the children were subject to significant instability in their home as a result of conduct in which AJM participated, including his multiple incarcerations for several different crimes, his use of illegal drugs, the violence in his relationship with JLD, and the physical abuse the children suffered at the hands of both AJM and JLD. *See In re C.E.K.*, 214 S.W.3d 492, 497 (Tex. App.—Dallas 2006, no pet.) (domestic violence and a propensity for violence, including a parent's abuse of the other parent or children, is conduct supportive of an endangerment finding).

Moreover, the record reveals that AJM's involvement with illegal activity and drugs continued regardless of the Department's removal of his children and its efforts at providing him with rehabilitative services. Shortly after the Department filed its initial petition in January of 2011, AJM submitted to drug testing which showed he was positive for both marijuana and cocaine on January 25, 2011. RR-8(3), P-Ex 17, pp.3-5. Bruce Jefferies, who was employed by the agency which

conducted the testing, described that AJM's results indicated he was a chronic user of marijuana, and had used cocaine more than once prior to the test. RR-7, p.22. Then, in September of the same year, AJM was arrested and later convicted of theft by check, for which he received 10 days' incarceration. RR-8(4), P-Ex 19, p.37. Two months later, in November of 2011 – eleven months after AM and JM were removed from his care – AJM again participated in drug testing which, according to Jefferies' testimony, showed him positive for cocaine at increased levels indicating he had again used the drug more than one time prior to the test. RR-8(3), P-Ex 17, p.7; RR 7, pp.22-23.

The record supports that AJM's continued drug use and criminal behavior not only subjected AM and JM to the possibility that AJM's parental rights would be terminated, but also supported the trial court's finding that AJM's conduct was endangering to his third child, IM. According to the Department's affidavit, attached to the petition it filed in January of 2012, IM was born on December 13, 2011. RR-8(1), P-Ex 9, p.72. That AJM was arrested during the previous September for theft by check and tested positive for cocaine use in January indicates he was engaging in this conduct while JLD was pregnant with IM.[7] *See Walker*, 312 S.W.3d at 616 (endangering conduct may occur before the child's birth). Moreover, the affidavit which was attached to the petition seeking IM's

---

[7] Jeffries' testimony indicated that the drug test results from these tests covered a period of 90 days preceding the date the test was taken. RR 7, pp.30-31.

removal made plain that AJM's continued drug use was placing his relationship with his children in jeopardy. The affidavit outlined not only that IM tested positive at his birth for marijuana, but also made clear that the Department was seeking termination of AJM's parental rights in its suit involving AM and JM as a result of his continued involvement with drugs. The affidavit states as follows:

> The agency is seeking to be named temporary managing conservator of [IM] due to the child testing positive for marijuana. The family has a current open case with CPS involving two siblings [JM], age three, and [AM], age five. Currently the Department is moving toward the goal of termination concerning those children due to ongoing drug use by the parents. [JLD] has tested positive on her hair follicle tests for marijuana and [AJM] tested positive on his hair follicle for marijuana and Cocaine.

> RR 8(1), P-Ex 9, p.42.

Even though the Department's petition as to IM made clear that AJM's use of illegal drugs was threatening his continued relationship with his children, as the two suits regarding AJM's three children progressed, the evidence was that he continued to use illegal drugs. On January 24, 2012 and then again on March 13, 2012, AJM submitted to drug testing which, on both occasions showed positive for marijuana and cocaine. RR-8(3), P.-Ex 17, pp.10, 12; RR 7, pp.23-24. Then in March of 2012 and later in December of 2012, the trial court entered decrees as to the Department's two suits. RR-8(1), P-Exs 4 and 10, pp.17, 49. In neither decree did the court terminate AJM's parental rights to any of his three children, but rather named the Department sole managing conservator of AM and JM and named IM's

grandmother, Pearline, IM's conservator. *Id.* Nonetheless, AJM's rights were severely restricted by both decrees as he was granted no specific right to visit AM or JM in the March 2012 decree, and in the December 2012 decree was only allowed to visit IM under the supervision of Pearline or another adult she named. *Id.* The evidence was, however, that even having had his rights so restricted as a result of his conduct, he continued to use illegal drugs. After the March 2012 decree, AJM tested positive for cocaine on May 22, 2012 and then again on September 4, 2012. RR 8(3), P-Ex 17, pp.16, 18. And after the December 2012 decree, he tested positive for cocaine on March 15, 2013 and August 20, 2013, and for cocaine and marijuana on October 1, 2013, October 8, 2013, and February 4, 2014. *Id.* at pp.29, 49, 58, 66, 76. Regarding AJM's use of illegal drugs, Jefferies testified that every test conducted on AJM showed positive for cocaine at levels indicating AJM was using it multiple times prior to each test. RR-7, pp.30-31. Jefferies also testified that AJM tested positive persistently over the course of the three years that the children were in the Department's care. *Id.* at 33. The trial court thus had ample evidence, even after the March and December 2012 decrees, in support of its finding that AJM engaged in a course of conduct endangering to his children.

That AJM prioritized his drug use over the well-being of his children was made even clearer by the evidence that he failed to take advantage of the many

opportunities he was afforded to address that conduct. On August 5, 2013, the Department filed a third petition, this one again seeking possession of IM after the child was found in the parents' possession in violation of the December 2012 decree which required that all contact between IM and his parents be supervised. *See* RR-8(1), P-Ex 11, pp.71. On August 20, 2013, the trial court again placed IM in the Department's temporary conservatorship, finding that there was a continuing danger to IM's physical health or safety, and that for IM to remain with his parents was not in his best interest. RR 8(1), P-Ex 12, p.81. On October 1 and 8, 2013, the court held a statutorily required Status Hearing, following which it ordered AJM to comply with the terms of a family service plan the Department developed for him. RR 8(1), P-Ex 13, p.94; RR 8(1), P-Ex 15, pp.106-13; Tex. Fam. Code Ann. §263.201 (West 2008). The evidence was that this was one of many times the Department had offered AJM rehabilitative services. At trial, the Department's caseworker Jasmine Green testified that over the time the Department was involved with the family, it had generated numerous family service plans which explained and outlined what the parents needed to do to have the children returned to them, but that the parents had declined to engage in those services. RR 7, pp.88-89. Nonetheless, the Department again offered several services to AJM after removing IM from his care in August of 2013. RR 8(1), P-Ex 15, pp.106-13. Green testified, and AJM's family service plan reflects, that the Department offered

AJM parenting classes, anger management, drug and alcohol treatment, individual and group counseling, and a psychosocial evaluation. RR 7, p.76; RR 8(1), P-Ex 15, pp.106-13. The evidence was that AJM engaged in drug treatment services, but nonetheless continued to use illegal drugs after completion of those services. RR-7 p. 98. Regarding AJM's efforts at making use of the services the Department had offered him, Green testified as follows:

> The Agency has had – has been involved with the family since 2011. In 2012, we were granted PMC without termination, given [sic] the parents extended amount of time to adjust their lifestyle to make the appropriate accommodations to parents of young children.
> Since I've been the caseworker, we've generated numerous family plans explaining and outlining for the parents what they need to do to have their children returned to them. The Agency did make one attempt, and the parents declined to engage and complete a court-ordered service; which in the Agency's opinion, is not necessarily putting your children's first – your children's needs before yours.
> Since that time, the parents continue to engage in un-parentlike [sic] conduct, which would, in my opinion, put children seven – ages seven, five and two in great danger due to exposure to substance abuse and abuse and not necessarily providing a structured and stable environment for them to grow up.

RR 7, p.88-89.

On this record, the trial court had sufficient evidence to find that despite several opportunities afforded AJM to address his drug use through services offered by the Department, he instead maintained his established pattern of testing positive for illegal drugs, subjecting his children to the possibility that he would be absent from their lives, as well as to the risk that his parental rights could be

terminated. This evidence supported the trial court's finding that AJM engaged in a voluntary course of conduct endangering to his children's well-being. Its finding under subsection (E) was therefore amply supported by the record and the arguments in AJM's brief to the contrary should be overruled.

**3. Though review of this ground is unnecessary, there was sufficient evidence to support the trial court's termination of the Appellant Father's parental rights under subsection (O).**

As already stated above, only one predicate finding under Section 161.001(1) of the Family Code was necessary to support the court's parental termination decision with respect to the father, and because the evidence clearly supported Subsection E, the court's findings under Subsection O need not be reviewed. *See In re A.V.,* 113 S.W.3d 355, 362 (Tex. 2003). Nonetheless, the challenge to the court's finding under O should also be overruled.

Under Subsection O, a trial court must find by clear and convincing evidence that the parent failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child. Tex. Fam. Code Ann. 161.001(1)(O) (West 2008).

Appellant's Brief does not contest that the father failed to comply with

actions necessary to be reunited with his children under an order for reunification, or that his children were in the Department's care for more than nine months. The sole contention is that there was no proof that the children were removed from him under Chapter 262 for abuse or neglect. This claim is without merit.

As made clear by the Supreme Court's in *In re E.C.R.*, the reference to a removal under Chapter 262 for abuse or neglect in Subsection O of Section 161.001(1) is a removal in which a parent "endangered [a child's] physical health or safety, such that initial *and continued* removal are appropriate". 402 S.W.3d 239, 245 (Tex. 2013) (emphasis added). The reference to "continued" removal recognized that even after an initial removal, a court must reassess whether to continue removal when a child comes into care under Chapter 262. In fact, even after a final judgment that names the Department permanent managing conservator without parental termination, a court must conduct regular placement review hearings to decide, among other things, whether "returning the child to a parent, is appropriate for the child." Tex. Fam. Code Ann. §263.503(a)(9) (West Supp. 2013).

Consequently, a removal initiated under chapter 262 for abuse or neglect can continue even after a final order that names the Department permanent managing conservator. That is consistent with what is recognized in Subsection (O) because it refers to a child who remains in the "permanent managing conservatorship" of the Department as a result of a prior removal under chapter 262 for abuse or

neglect. Tex. Fam. Code Ann. §161.001(1)(O) (West 2008).

In this case, the evidence clearly shows that the "initial" removal of the three children under Chapter 262 was appropriate because of parental neglect, and that such neglect "continued" to make the removal appropriate, even after the final judgments in 2012. Namely:

1. *Both parents engaged in a well-established pattern of illegal drug activities resulting in incarcerations in the decade before their first child was born in 2006.* RR-8(1) p. 13 & RR-8(4) pp. 53-99 and RR-8(1) p. 12 and RR-8(4) pp. 3-51 (1993: AJM sentenced 3 years for manufacturing and delivering controlled substance; 1995: AJM sentenced for evading arrest; 1996: AJM sentenced to 7 months jail for possession controlled substance; 1998: AJM sentenced 40 days for possession of controlled substance; 1999: AJM sentenced 15 months for manufactury/delivery controlled substance; 2001: AJM sentenced 2 years for manufactury/delivery controlled substance; 2003: JLD sentenced jail time for possession marijuana, failure to identify and prostitution; 2004: JLD arrested again for possession controlled substance and sentenced one year; 2005: AJM sentenced for possession marijuana).

2. *Shortly after birth of their first child, AJM arrested for theft and sentenced 20 days.* RR-8(1) p. 13; RR-8(4) p. 76.

3. *When their second child was born in 2008, JLD tested positive for marijuana in 2008.* RR-8(1) p. 12; *See also* RR-8(1) p. 11.

4. *After second child born, AJM convicted for another drug crime as well as an assault against a family member.* RR-8(1) p. 13; RR-8(4) p. 81 & 86 and p. 91.

5. *Department confirms problem with parents' illegal drug activities after investigating referrals.* RR-8(1) pp. 8-11.

6.    *After Department named temporary managing conservator on January 12, 2011, mother commits crime and third child born.* RR-8 p. 14. RR-8(4) p. 37 (September 4, 2011, JLD committed theft by check and pled guilty). RR-8(1) p. 42 (2011 IM born).

7.    *Third child tests positive for marijuana and both parents also test positive for drugs.* RR-8(1) p. 42 and p. 43.

8.    *March 27, 2012 Department appointed permanent managing conservator of two oldest children.* RR-8(1) p. 18-19.

9.    *December of 2012, the court appointed "Pearline Myrick" as IM's sole managing conservator.* RR-8(1) p. 50; RR-8(5) p. 19.

10.   *Illegal activities of parents continued after 2012 decrees.* RR-8(4) p. 43 (2013: JLD committed a prostitution crime and was later convicted on her guilty plea); RR-8(2) p. 32; RR-8(3) p. 49 (August 20, 2013, drug testing on hair specimens confirmed parents positive for cocaine); RR-8(4) p. 49 (August 29, 2013, JLD committed a crime involving possession of marijuana and was subsequently convicted on her guilty plea). RR-8(4) p. 49; RR-8(2) p. 47-47; and RR-8(3) p. 57 (October 8, 2013, drug reports confirm JLD and AJM positive for cocaine and marijuana on a hair specimen); RR-8(3) p. 76 (AJM tested positive for cocaine on a hair specimen source).

The foregoing evidence, which is primarily undisputed, conclusively establishes that all of AJM's children came into care under chapter 262 initially because of neglect as a consequence of the dangerous environment perpetuated by their parents' longstanding illegal activities and drug use. Moreover, even after the parents were removed as conservators under final orders, the court continued the children's removals because of the parent's inappropriate neglect to these children by continuing their illegal drug activities. On this record, the evidence was more than sufficient to support the court's conclusion that these children remained in the

Department conservatorship as a result of initial and continued orders for removal under Chapter 262 for parental neglect.

It is noted that Appellant's Brief claims because the children did not verbalize they had been physically abused, had no injuries, marks or bruises and their apartment was clean, there was no proof of abuse or neglect to warrant a removal under Chapter 262. Appellant's Brief at p. 45. Nevertheless, as discussed by this court in *In re R.M.S.*, the Supreme Court clarified that the terms "abuse or neglect" are interpreted broadly to include the risks or threats of the environment in which the child is placed. 2013 WL 5637703 *22014 WL 6792036 (Tex. App. – Houston [1st Dist.] 2014, no pet.). The proof concerning the parents' pattern of illegal activities, primarily involving illegal drug use, unabated after the children's removal, confirmed the risk of the environment to support the court's initial decision to remove under chapter 262 and the court's continued removal after removing the parents as conservators. Because the proof as to the other elements for Subsection (O) are unchallenged, the trial court's finding under Subsection (O) should be affirmed.

WHEREFORE, PREMISES CONSIDERED, Appellee Department of Family & Protective Services requests that this court affirm the trial court's judgment and for such other and further relief as appropriate in law or in equity.

Respectfully submitted,
VINCE RYAN

COUNTY ATTORNEY

By: */s/ Robert J. Hazeltine-Shedd*
**Robert J. Hazeltine-Shedd**
Assistant County Attorney
State Bar #24067652
1019 Congress, 17th Floor
Houston, Texas 77002
Phone: 713/274-5292; Fax: 713/437-4700
Email: robert.hazeltine-shedd@cao.hctx.net
Attorney for Appellee,
Department of Family & Protective Services

## CERTIFICATE OF SERVICE

I hereby certify that on this the 26th day of January, 2015 a true and correct copy of the foregoing Appellee's brief was sent to all parties to this appeal by sending a copy of this brief by (1) electronic transmission to William M. Thursland by email at wmthursland@hotmail.com and/or by certified mail to 440 Louisiana Street, Suite 1130, Houston, Texas, 77002.

*/s/ Robert J. Hazeltine-Shedd/*
**Robert J. Hazeltine-Shedd**

## CERTIFICATE OF COMPLIANCE WITH NUMBER OF WORDS

This is to certify, pursuant to Tex. R. App. P. 9.4(i)(3), that the foregoing computer generated brief consists of no more than 15,000 words, excluding the caption, identify of parties and counsel, table of contents, index of authorities, statement of the case, statement of issues presented, statement of procedural history, signature, proof of service, certification, certificate of compliance and appendix. Relying on the word count of the computer program used to prepare this document, the number of words, subject to count under the rules, is 12,755 words.

*/s/ Robert J. Hazeltine-Shedd/*
**Robert J. Hazeltine-Shedd**